Good morning. Please be seated. We're not giving anything away. I mean, I've never seen so many people here from Walmart. Good morning and welcome to the Second Division of the First District of Public Court. Madam Clerk, would you call the case please? Would the attorneys who are going to argue please approach the bench, identify yourselves, and advise the court of how much time you would like for your arguments. I'm Amy Ingram representing Timothy Fountain. I'd like approximately 15 minutes with a few minutes for rebuttal. All right. Good morning, Your Honors. John Nowak, Assistant State Superintendent on behalf of the people. I'll also take about 15 minutes, Your Honors. Very well. Now, that microphone is for recording purposes. It's not for amplification. So if all these people are interested in what you're going to say, so keep your voice up, please. Ms. Ingram. Good morning, Your Honors, and may it please the court. My name is Amanda Ingram, and I represent Timothy Fountain. There are five issues on appeal, and with the court's permission, I would like to address the first two this morning. The cornerstone of the criminal justice system is a fair trial. Essential to this purpose is the idea that defendants must have reasonable time to prepare and respond to evidence disclosed by the state, and any evidence admitted at trial must be relevant and accurate. In this case, efforts at a fair trial were thwarted by the trial court's major consistence that the state's $11 disclosure that Fountain was included by the DNA report did not merit a continuance beyond a single day. Additionally, the historical cell site evidence in this case should have been subjected to a trial hearing where the relevant scientific community does not accept that cell site evidence is accurate for location. In September of 2006, before Fountain had been arrested and before the state had obtained his buccal swab, Cellmark issued a DNA analysis report which definitively excluded Fountain as a contributor to the mixed DNA profile obtained from Guerrero's fingernail clippings. In March of 2007, the Illinois State Police Crime Lab issued a separate DNA analysis report which also excluded Fountain as a contributor to the DNA, although the discrepancy was at a different location than the Cellmark report. For over five years, the defense strategy was built around these two reports, which excluded Fountain as a possible contributor to the DNA. More days before trial was set to begin, the state disclosed a newly revised report that indicated for the first time that Fountain was included as a possible contributor to the mixed DNA profile. Understandably, defense counsel requested a continuance in light of this game-changing last-minute disclosure. So you didn't learn about it until the new report. There were two new reports, weren't there? There were two new reports. And so when you received the first one, you were alerted to it, and then a couple days later you received the second. That's correct. And the difference between the two? It was in the billions in terms of the statistical calculation, you mean? Yes. The initial report, he was excluded. The third report, I think the statistical calculation was 1 in 37 billion. Then it went to 1.7 billion in the final last report disclosed. Again, this is just days before trial, 1 in 56 billion. What would constitute meaningful continuance under the law? I think a meaningful continuance in this circumstance would be a continuance that was in line with the continuances that had been happening prior to the disclosure. So a matter of, I think the last continuance before that date was about three weeks long. So three weeks, 30 days. Some continuance within the normal range that would give the defense attorneys a chance to consult another expert, perhaps retain another opinion, and just address the game-changing facts that was just revealed to them in the days before trial. Again, this was a strategy that had been in the making for years. Did he ask for that, three weeks? Defense counsel did not ask for three weeks. Initially, defense counsel asked for a continuance, but the trial court almost immediately shut that down and said, at most, it would possibly, and that is a direct quote, possibly give them a day. So a single day was the only offer that the trial court gave them. And in fact, the trial court even questioned, why do you need a day right now? The trial court's overarching concern was with just getting this case started. And again, this case had been pending a long time, and it's understandable that everybody would want this case to go to trial. But when the defense asks for a continuance, there are numerous factors that go into when the trial court may grant or deny it. And in this case, every single factor that goes into an analysis of when a court denies a continuance weighs in Fountain's favor. This was not his fault. This was no fault of his own. It was entirely the state's fault for not disclosing this evidence until the last minute. This was a double murder. This was an incredibly serious case. We're aware of all that, but it seems to me that a report was dated October 18th or 17th, given to defense counsel on the 18th. They advised the court that they just got, that they wanted time. It was continued to the 19th, then to the 22nd. On the 22nd, the defense lawyer said, just give us one more day. Now, granted, the court may have been indicating strongly that it didn't understand why more time was needed. But it did, the defense lawyer did ask for one more day. And I'm going to get to my point. I'm almost like a lawyer again. The court did give one more day as requested. But wasn't there also an overlapping knowledge of everyone that the trial was going to be somewhat lengthy? That during the course of the trial, nothing would prohibit the defendant's team, as it were, to further analyze this new report. And that ultimately, the new report, or there was no, to my understanding, no presentation by the defense that based on this new report, we need to get our own new report. It was simply time to absorb the impact of the new report. So it's not a situation where, judge, I just got this report and it's damaging. I need to have my expert review it so that he can come up with a rebuttal report. That wasn't presented, was it? No, that wasn't presented. And it's true that this was a long trial, and I think the parties involved expected it to last for several days. But that is, again, this was a double murder trial. The defense team, this is not all they have to do. They have to prepare for voir dire. They have to prepare the opening statements. They have to prepare their cross-examinations for every other witness that the state was going to be bringing on. I mean, a single day, it was simply not adequate to confront this. But they had more than a single day. They had more, they were offered a single day before the start of the trial, I suppose. Right, but they had plenty of time to absorb the impact of the new report. Well, they had plenty of time to absorb it themselves. But, again, their expert was an expert in population genetics. He was not an expert in forensic DNA analysis. So his field of expertise was in statistical calculations. He's not the one who could look at these labs, which, again, these numbers are incredibly fluid. Whoever is looking at this DNA data, it changed four times between lab to lab and analyst to analyst. He can look at the statistical calculations and figure out if they're flawed or not. But he's not one who could explain why do these numbers keep changing and why is one analyst seeing a 7.9 where another one is seeing a 7.7? You would agree that Fountain was prejudiced? Yes. What in the record establishes prejudice? What in the record establishes prejudice? Well, again, like I said, there are numerous factors that go into deciding when a continuance has been mechanically denied, and that's exactly what happened here. The court was not seriously considering the impact that this was having on the overall defense strategy. I guess Justice Hyman's question is, okay, how was he prejudiced by that? How was he prejudiced by that? What was a demonstration of prejudice in the record that we could point to and say, because the court didn't give the continuance that you thought he should have given, he was prejudiced right here? I'll accept that friendly amendment. Well, again, the defense attorney herself said, I will be ineffective if I do not get a continuance. I need to get an expert to look at this. She said she needed to get an expert to look at this? Yes. And the judge, I understand, was a different expert than the expert that had been? Well, again, they were able to give it to their retained expert, who, again, was an expert in the field of population genetics, not forensic DNA analysis. But, again, part of the days here were over a weekend. So even if they had wanted to consult with another expert or in some way talk to somebody else, it certainly wasn't going to happen over a weekend. And by the time Monday arrived, they know they have to be ready for trial. They have to be ready for everything else that was going on in this case, not just this particular aspect of it. Did they confront the judge and say, given that we have to interview other witnesses and we have to think about this and think about that, we cannot possibly address this thing? It's prejudiced and I'm clamped because I need to do this or that? They didn't do that, did they? I disagree. The defense attorney was trying to import to the judge, this is game-changing evidence. This is like the rug has been pulled out from under us. That would be ineffective. Why didn't he move just to bar it? That's a good question. And I raise that same point in my brief, that at the very least, this kind of, he was only consistent at 4 of 13 loci, which is not a true match. He was possibly consistent at 5, possibly 6, possibly 7, possibly 8. At best, he was possibly consistent at 8. And I am specifically using the terms possibly consistent because anything fewer than 13 is not a true match and should not be referred to as a match in any form, especially in front of a jury. He's only one of 1.7 billion. According to those statistics, however, this court has recognized in other cases, the studies that have shown that even with those astronomical numbers, that numerous individuals, thousands of individuals and hundreds of pairs, can be consistent at anywhere from 4 to 8 or even 9 loci. So at minimum, these numbers, the DNA numbers in this case, had virtually no probative value as far as identification goes because, again, he was not a true match. And even though these numbers kept getting better and better and better, depending on who was looking at it from the state's perspective, at no point was he ever a true match across 13 loci. But even a 9 is not a true match. A 9 is not a true match. A 10 is not a true match. In this case, he only, and again, not using the term match because I do think it's particularly misleading, but he was consistent at 4. He was consistent at 4 of 13. And the rest, maybe he was consistent at 5, maybe at 6. And even the, I think it was Pauline Gordon, the state's witness for one of the reports, said for the ones where it was possible and inconclusive, inconclusive means it's possible and any other number is a possibility, any other number. And yet, and yet, the state is still allowed to argue in front of the jury repeatedly. It is him. The DNA identifies him. You're getting DNA off the chrome pistol? No, I don't. I think the DNA sample in this case came from underneath one of the fingernails. And it was a mixed, it was a mixed sample. So during the extraction, they have one profile that was presumably Mr. Guerrero and one profile that was presumably the offender. The rule 417 of the criminal rules provides that DNA evidence, this rule is promulgated to produce uniformly sufficient information to allow a proper, well-informed determination of the admissibility of DNA evidence and to ensure that such evidence is presented competently and intelligently. Does that have any relevance at all to this issue? Yeah, I would say it does have relevance to this issue. I mean, DNA is highly persuasive and certainly has been a great gift in many ways to the criminal justice system in terms of making accurate identifications of people who are involved. But the problem comes when you have a case like this where there is a mixed sample. It's not a, you know, it's not a vial of blood that's capable of producing a complete profile. So it's not, you know, in this instance, again, the first analysis done of what DNA matter was there, excluded fountain, definitively excluded fountain at one loci. And that's all it takes. An inconsistency at one loci is all it takes. What about Counsel's performance at trial? It could be said she did an excellent job, considering. Right. Should we take that into account, that she was able to cross-examine and do what you're supposed to do in regard to the trial itself? Yes, Counsel definitely did the best job that she could under these circumstances. And there's a difference, of course, between a complete lack of Counsel's ability under chronic and a regular ineffective assistance of Counsel, as in this case. And, you know, I don't make this argument lightly, but this is a situation where Mr. Fountain was facing incredibly serious charges. This last-minute disclosure of him, just imagine, just imagine for a moment, from the defense perspective, where you are excluded, the DNA excludes you, and all of a sudden, the eve of trial, guess what? Now you're included. There is perhaps no other turn of events that could be more devastating, from the defense perspective, than to go from excluded by the DNA to possibly included. Going from a lack to a case, right? And he had a lock on it. If he's excluded, he pretty much had a lock. Right, because how persuasive would that be to a jury? Then my question is, why, I don't know if you know this, but why did the state continue to prosecute if their own expert said it doesn't match? And all this time, then they go to the eve of trial. What's going on here? I can't answer that question. I don't know. But it's strange. It is strange. But the fact of the matter is that, again, the report from September of 2006 and the report from March of 2007 both exclude Fountain, and that was the information that the defense had when they're going forward and crafting their strategy in this case. But that wasn't the only evidence indicating that it was not the only evidence that the state relied on to prove all the elements beyond the reasonable doubt. No, no, that's not the only evidence. But, again, had this evidence been excluded, then certainly the remaining evidence would have been in a vastly different light. And also, had the DNA evidence at minimum been paired with the database search so that the jury would have real-world numbers to show a concrete example of just how flawed those astronomical numbers are, then certainly the remaining evidence would have been viewed in a different light. The analysis here is not outcome determinative. This court had only found a reasonable probability of a different outcome. And whether that's that the evidence would have been viewed in a different light had it been excluded or the evidence viewed in a different light had the jury been able to pair the astronomical numbers presented by the state with numbers from the real world, at a minimum there's a reasonable probability of a different outcome, especially given the high value that juries place on DNA evidence in general. Okay, given the time constraints, I think we should move on. Yes, thank you. Just briefly regarding the... What do you make of this conspiracy frame-up that the prosecution put together? I thought it was outrageous that the prosecutor would tell the jury that the Illinois Lottery Commission and the police and the crime lab and virtually every person who had any minor thing to do with this case was part of a grand conspiracy. I thought that was a terrible argument, absolutely. Did it cause anyone to flock into his camp? Into his camp? No. I mean, I don't know. But with regard to the jury argument to the closing argument of the state, that is an example of where you can see prejudice in this case. Turning just briefly back to the DNA, the state repeatedly argued to the jury, it is him, he is identified by the DNA evidence. And again, with the cell phone evidence, the state repeatedly argued, we know it's him, we know it's him, even though that's not true. The cell phone evidence, again, has not been subjected to a fry hearing and it's not accepted by the relevant scientific community. While it has been accepted by the courts, it's not been accepted by the relevant scientific community, and that's the key difference. Just because it's been accepted by the courts doesn't mean that this court should ignore the current academic work relating to this issue and find that perhaps it is time for an update. Because the technology, especially when it comes to cell phones, is constantly changing. This is not a case where the cell phone was outfitted with GPS. There was no triangularization. This was just these towers are pinging, and they happen to be pinging off in that area of the crime scene. But we don't know the reach of those towers. We don't know the wattage output of those towers, the radio frequencies. There's so many variables, and particularly in an urban environment like Chicago where there are who knows how many cell towers in an area, you don't know which ones are working. You don't know what carrier the software has. There were no confirmation tests done in this case. Are you aware of any Illinois decisions with regard to fry hearings on cell towers? I'm not. I'm not. But from Mr. Fountain's perspective, that is an example of why this is a novel subject and it should be subjected to a fry hearing. Are you contending that the technology today, based on what the experts know today, if they viewed the evidence from 2005, that they would come up with a different conclusion than the FBI agent who testified in this case? Well, no. It's not so much they would come up with a different conclusion, but it's just even with the agent Rashke's testimony in this case, he had no idea what the reach of the tower is. And all he could say is that if the phone, if we get a signal that's pinging from this tower, then we know it's in the coverage area, but we don't know what the coverage area is. We don't know how small. We don't know how wide. He lived within two miles or something? He lived within a couple of miles of the area. And that can affect, as I understand it, the technology. That can have an impact. You could be calling from two miles away. It could ping because it's going to the north side. Right. And, again, these were largely incoming calls. So these weren't calls that Fountain was making on his phone. These were calls that somebody else was making on their phone to Mr. Fountain's number. So, again, that's something else that can, according to, again, current scholarly articles on the subject can impact what tower is pinging. And in the absence of knowing, at minimum, what the reach of these towers was at the time, there was simply no basis for this kind of evidence to be in front of a jury without a fry hearing. And, again, this is not an argument to say that this kind of evidence can never be in front of any jury ever. But it is a plea for this court to have a fry hearing and establish some standards and establish under what circumstances and in what context will this evidence be allowed. Are you saying that there was no foundation for this FBI agent's testimony? Right. Yes. That's somewhat of a separate issue, but yes. He stated as an expert in the record. He did say he was an expert, but that was strongly disputed by defense counsel, yes, because he's not a scientist. He's not an engineer. I think he said he was an accountant who works for the FBI and does these reports. But he doesn't have any particular expertise in cell phone technology, radio frequencies, or any of the other technological areas that would be relevant to this issue. The deficiencies that you're pointing out were pointed out to the jury, correct? They were. Correct. So the defense lawyer, would you say, thoroughly tested the agent's testimony with respect to what he was talking about? Certainly the defense attorney gave a vigorous cross-examination of Agent Raschke, but that's after the fact, after the court had already allowed for this evidence to come in without subjecting it first to a fry hearing. Okay, so what was the error in having that testimony in front of the jury? In other words, had the same testimony been presented to the court at a fry hearing, and he said, okay, that can all go in, and it went in as it did, how was the defendant prejudiced? Well, again, then we'd be looking at a lack of foundation for what he was testifying about, given that, again, there's no testimony or evidence regarding the reach of the towers and those other factors. And that was brought out through cross-examination. But cross-examination, again, that's no subject for a real fry hearing and establishing standards for when this kind of evidence can come in the future. And the prejudice would also be that, again, the state is allowed to, was arguing to the jury that, you know, we know it's him, we know it's a cell phone, when that's, it's just not, it's not accurate, and it was prejudicial for the jury to hear that kind of argument. If there are no further questions? Do you have anything else? We've been interrupting you like crazies. I think I covered everything, thank you. Okay. Well, thank you very much. Mr. Nowak? May it please the Court. Again, my name is John Nowak. I'm an Assistant State's Attorney, and I represent the people of the state of Illinois in this case. Your Honors, this defendant had a fair trial, and he was properly convicted of armed robbery and of the first-degree murders of Graciela Rodriguez and Nicholas Guerrero. Now, first, the first issue the defendant raises is about the DNA and the continuance that he requested. The first point I want to clarify for this Court is that in that 2007 report from Devere Jackson, she included defendant. That is to say, specifically, he was not excluded. It was, that was in her written report. In her written notes, though, because she later explained, there was an error in writing it. She omitted one of the alleles, and the defense expert recognized that and said based on the worksheets that she had with her report, it excluded him. And why did you wait until the eve of trial? I mean, you had all these years. It was in response because it was defense expert. The response was in 2010. I believe it was after that, the defense expert. It was at least a year and a half before trial. They got it. I can't explain. I wasn't one of the trial. If you can't explain it, then what you're putting, right, this man's going to jail for the rest of his life, and you're saying, oh, we can just give this very different information on the eve of trial? Your Honors. Without any excuse? The report from the defense expert came fairly late in the process. And once it did, we got it to you. How long was it? I checked the year if you want to know it. I believe it was in 2012, but I can't speak specifically to that. It wasn't far before the trial. But let me get to your point, Your Honor. And that is that this report, however long it took, Devere Jackson. It was 2011. It was 2011. So it's a year and a half. For whatever reason, that report spurred a reanalysis by the Illinois State Police. And that new report came out from Devere Jackson on October 17th. And you didn't tell counsel? I told the defense counsel that you were reevaluating. That's not on the record, Your Honors. I don't know whether they did it or they didn't. It's not on the record. So it's on the record. So all we have is that it was a bigger surprise. That's what they said on the record. And so on October 18th, they get the report on the 17th. On October 18th, they're in court. They request a continuance. The trial court reasonably wants to hear more argument on this, more consideration. They come in the next day on October 19th. There's additional arguments and information given to the court. And, again, the matter continues to October 22nd. And that is the day the trial is supposed to begin. And this is the day where defense counsel requests of the court expressly, we'd like one day continuous, Your Honor. And the trial court granted it. Did you object to a request for continuance at any time? I don't believe it's in the record that we did, Your Honors. I'm asking, is it in the record? I'm not going to guess for that. But I can tell you this, that most of the argument was that the state didn't respond. There was much more argument on this point, obviously, by defense counsel. Defense counsel eventually just asked for one day on October 22nd, and the trial court granted that. And so this court's review is whether that was an abuse of discretion. And we know that it wasn't, Your Honors, because we know that this defense counsel had plenty of time to absorb it and respond to it. What do you mean plenty of time? What does plenty of time defense counsel had? We know, Your Honors, because Devere Jackson didn't testify until the 25th. Pauline Gordon testified on the 26th. And the defense expert testified on the 29th. We know by looking at the record, looking at this cross-examination, this thorough cross-examination. I hate to interrupt you, but don't counsel have other things to be doing? They have to sleep. They have to eat. And they have to be at trial all day. So now you're telling me that they can do how many things at once? They did. They did all these things. That's what's so impressive, Your Honors. But that's the question. They might be forced to do it. The question is, is that due process? It is, Your Honor. It's fair. It is, Your Honor. Why is it fair? It's fair because we know the results. We know that there was no one who was found guilty. No, we need to look at the result of how they approached it and how they absorbed and how they responded to this new report. There was a thorough cross-examination of Devere Jackson, a thorough cross-examination of Pauline Gordon, and a thorough examination and presentation by defense expert Mueller. He had, in that time, he created not one, but two charts presented before the jury in which he laid out, this is what the 2007 report said, here is what I said that shows it's excluded, and here is the new report from Jackson and the new report from Gordon. Two charts on that. Thorough examination on that. There is no suggestion by the defense counsel at trial or tellingly by defense counsel on appeal, either in the opening brief or in the reply brief, of what else defense counsel would have done with more time. There's not a suggestion at all, Your Honors, before this court as to what else they could have done. You take that as wavering? It certainly can't be raised at this point, and it certainly wasn't raised in the reply brief, and I didn't hear it even in the opening argument here. What else? Justice Pierce, I believe, asked specifically, what else could defense counsel have done? What was the prejudice here? Well, Your Honors, we know that there wasn't any actual prejudice because defense counsel had plenty of time, as we know from the record, to attack the cross-examination. Well, counsel said they may have gotten a new expert. They didn't have time to do that, did they? Your Honors, they had the expert. Could they have gotten another? Maybe they needed a new expert. Counsel's argument was that the expert they had was on a different issue, not on forensics. That is a new argument, Your Honors, because defense counsel at trial never said, Your Honors, we need a different expert. They never said that. That was never requested by defense counsel at trial. So we need to get this to our expert, but that was Dr. Muir. One would presume, in the course of trying these cases, that if they had this expert, Dr. Muir, who was obviously consulting with them during this period when they got the new report, one would think that that expert would say, You know what, this is beyond my skill. You need Joe Smith, who's an expert in this area, to tell you better. And you would think, you know, a reasonable lawyer. These lawyers did a nice job with what they were confronted with. They would have said, Judge, we can't confront this new report because the expert we have isn't an expert in that field. We need Joe Smith. Precisely, Your Honor. Precisely. And that's not in the record. And that's not in the record at all. On the contrary, based on the testimony of Dr. Muir and these detailed charts he presented, he was well qualified to respond to this. And he highlighted to the jury how that initial analysis by Jackson in 2007 excluded the defendant. And defense counsel, of course, picked up on this in her closing argument. And Dr. Muir, in his testimony, he talked about how with that first ISP report, it produced a total of 21,504 different possible genetic profiles that would not be excluded. It testified, Dr. Muir did, based on the new report. He had plenty of time to do another calculation and said, now with these extra types, they now had 64,512 possible profiles and that the final ISP report now had 86,016 possible profiles. That was before the jury. And Dr. Muir had plenty of time to make those calculations. What was your justification, if any, for the late report? It's not in the record, Your Honor. So you never justified it on the record? There's nothing either way about it, Your Honor. And again, defense counsel asked for a day. Of course they asked for a day. It's their position. I mean, the judge said that. Defense counsel didn't ask for any specific period of time until October 27 and said, Judge, we need a day. And because she asked for a day, we can only presume that over the weekend, as defense counsel pointed out, they're working on it and they realize we only need a day. We only need a day. That's what they asked for. And the issue before this Court is did the trial court abuse its discretion in gramming that one day continuing what the defendant asked for? And it didn't. There simply was no prejudice here. And as to the second part of this DNA issue, counsel was not ineffective. And again, this all has to be framed. This was not solely a DNA case. Far from it. We had an eyewitness, Brandon Grisak, who sees that defendant outside at the bus stop, describes what he's wearing. He's wearing a dark shirt. He's got something on, some lettering. He's wearing blue jean shorts and a black white socks cap. We see that in the video. We see Brandon in there. Then everybody leaves and then a person comes in. He matches that description. He's wearing a dark shirt, lettering on it, blue jean shorts, white socks cap. We've got all that. And then we'll get into the cell phone. But there's so much more to that plus the cell phone plus the DNA. It's not just a DNA case. And here, defense counsel made a strategic decision on how to challenge that DNA evidence in a particular way. Defendant doesn't argue that defense counsel did a poor job in the way that they approached it. Far from it. Defense counsel did a great job in that. But she said she made additional attacks. But that's not the stricken standard. And here, a motion to exclude these DNA mates would have been futile. It was not just a match at four. It was a possibility of matching at eight. So there was a possibility. Partial match? What's that? Because the defense, all the experts in this case said, look, there are different alleles here, the ISP experts. So there are different ways you can interpret it. It could be this one. It could be this one. There may be three, possibly two different kinds that could match here. And that's why the numbers that Dr. Mueller testified to, why it kept going up, why there were possible so many different combinations. But here, Your Honors, we know that if defendant had filed a motion to exclude based on here, there's an eight loci match. This court had already held in 2011 in People v. Mitchell that a four loci match was held irrelevant and admissible. And there was a vehement dissent. And we don't have to follow that case, do we? You don't. Of course you don't. I'm not making an argument. But the trial court did. The trial court has to follow relevant appellate court law. And the relevant appellate court law was four loci is enough. Which is incredibly low. Four out of 13 is millions of people being included in that. I mean, in the literature, nobody cited, at least I didn't see anything in the briefs, to say that that even is in the realm of reasonableness. We all have one, either male or female. So, you know, down to three. So half the courtroom could probably be included. This was litigated in Mitchell. And I'm not re-arguing it here. I'm just saying that Mitchell may have been wrongly, possibly, but the trial court was in no position to say, you know what, I believe Mitchell's not correct. And that's why I'm arguing, that's why the argument is, is that defense counsel wasn't ineffective for not filing this. If defense counsel had filed it, the trial court was bound to follow Mitchell. And it said four is enough, and here we have eight. And again, and as the second part of the ineffective assistance argument goes to, why didn't defense counsel ask for a database search? Why not go on this fishing expedition? Again, there's no requirement under statute that defense counsel do this. But there was certainly no prejudice in not making that motion. Because even if that fishing expedition proved successful and they pulled somebody out of that database, that person would not have been matched the description that Brandon Griesiak gave. That person was not the one with the dark green, the dark shirt with the laddering. That person wasn't the one with the blue jean shorts and the white socks cap that we can see in the video. That person does not have defendant's cell phone that we know, and this flows into the next argument, that person didn't have defendant's cell phone as it's moving that day to Maggie's Food Store and then back. In conclusion, your honors, on this DNA issue, this defendant received a fair trial. As to the cell phone testimony, your honor, it is well established in the courts throughout this country that a FRI hearing is not necessary for the simple cell historic site analysis. There's not a single case defendants can cite to that holds otherwise. The FRI standard applies, it's limited to scientific methodology. It has general acceptance. It's considered as a general acceptance in Illinois. Any case? No published case, your honor. Not so, there's no case line. Is there an unpublished case? There may be. You don't know. I hesitate to make that argument here, that there's an unpublished case. But there are no published cases, and throughout the country, this has been uniformly held to be sufficient under FRI. But we have a court that's not under FRI. There's a federal court, but right here down the street, we have a judge who ruled the other way on this particular expert. It was a different theory there. It was under this granularization theory, which never was made here, where they were trying to figure out exactly where it was. That is not an issue here, and no court has ever found that. That is, SAFRT's been held as an outlier. But here, your honors, the only dispute in the courts across the country is whether expert testimony is even needed at all for this type of testimony. Because all this testimony is, is that it says, here, defendant's cell phone connected to this particular tower at this time on this date. That's it. And it's simply using that. The reference is supposed to be taken from that. And this flows into the foundation argument as well, your honor, that, as Agent Rashke testified to, that cell phone is designed to connect to the tower that it's getting the strongest signal from. And it's pinging, it's pinging out every five seconds, he testified to. So when an incoming call comes, that cell phone is connected to the cell phone that that particular cell phone that's getting the call connects to that has the strongest signal. And how large of a coverage area could that tower include? As Agent Rashke readily admitted, he wasn't able to test that because the towers had changed. But he did testify as to the foundation, which is that it connects to the tower with the strongest signal. And if he doesn't know that, then, I mean, how is this testable? That's maybe why technology has changed, things have changed. But we're talking about 2007. Yes, sir, 2007. He's going back in time. And there isn't much there for him to look at. He's not an engineer, he's not an expert on cell phones. No, he was qualified as an expert in the field of historical cell site analysis. The defendant is not challenged with that qualification on appeal. Go ahead. Well, I'm just, so he testified to that, that the defense moved to strike this testimony as not being relevant? No, your honor. Is there any motion to strike this testimony for lack of foundation? I don't believe so, your honor. Okay, go ahead. How many towers were around Maggie's? There were several, your honors. And there were, the closest was what, 1.1 mile away? It wasn't that far, your honors. 1.2? As we can see, it was in Agent Rashke's PowerPoint presentation, which is before the court on appeal. It appears that there are four around it that his cell phone connected to around the time of the murders, both north, south, east, and west of it with Maggie's food store right in the middle. It's more than a mile is my understanding of the record. I think the minimum was 1.1 miles. We don't know who called.  What we do know is it's connecting to the closest ones. And when you do look at, if you take a look at Agent Rashke's exhibit here, you can see that from where Maggie's food store is, the crime scene, and where those particular towers are, those are the four closest towers to it, and it's in the middle. But, your honors, it's more than just where his phone was getting the strongest signal from at the time of the murders. Where was it getting the strongest signal from in the morning, before the murders? It was getting the strongest signal farther south at the cell phone tower that was closest to his girlfriend's house, which is where he lived. That's from 10.01 to 11.24 a.m. And then, after that, from 11.24 to 11.54 a.m., his phone starts connecting to different towers that have the strongest signal. Not coincidentally, your honors, that is progressively going north on cell phone towers, going north along the expressway, along I-57 and up the Dan Ryan, getting the strongest signal from those moving north. And then, around the time of the murders, yes, it's hitting and getting the strongest signal from the four towers with Maggie's food store in the center. Did the FBI agent use any scientific calculations to take into account the factors that can affect coverage? No, he didn't, but he did testify that those impediments, geography, big buildings could do it, but that it's always looking for that closest, strongest cell signal it's getting. Did he present any scientific calculations? No, your honors, and he readily admitted that he didn't. The basis here, your honors, courts across the country are clear. There's no frying the hammer necessary. As to the foundation, there was a proper foundation here. Under Rule 705 for experts, this defendant was qualified as an expert. It said that an expert may testify in terms of opinion or inference and give reasons therefore without first testifying to the underlying facts or data unless the court requires otherwise. The expert may, in any event, be required to disclose the underlying facts or data upon cross-examination. Here, Agent Raschke, qualified as an expert, not challenged on appeal, testified on direct and on cross-examination to the underlying facts or data. He testified, again, your honors, about how cell phone towers work, how cell phones react, and how they're always looking for that closest signal. That was the foundation for it, and here he gave the foundation of specific data for this particular case, which is that he received and analyzed the U.S. cellular call detail records from August 4th for the phone number registered in the defendant's name. He used those records in a map. That's all it was, taking the records and putting them on a map where those cell phone towers are. And he plotted those towers from 10 where the defendant's phone was connecting to from 10 to 1 a.m. through 124 p.m. That's all it is, looking at the records and plotting them on a map. It is simple, and that is why the only dispute in the courts is whether you really even need an expert to do that. It's just simple, simple facts, simple physics, and the defendant and Agent Rashke laid a proper foundation for it. Now, the defendant's argument about we just didn't test the strength of it, doesn't know about this, doesn't know the signal strength, that all came out at trial. That goes to its weight, not its admissibility, and the jury heard everything about that as far as this point. And there was no motion to strike this testimony? There was no motion to strike his testimony, your honors. This testimony came in without objection on that point. He was not challenged, and he's not challenged as an expert on appeal. And just briefly, your honors, because Justice Simon asked about the grand conspiracy argument. Your honors, in three cases this court has held that that is a proper response to a defense theory such as in this case. Here, this came in rebuttal. It was in direct response to the closing argument. Here are just a few of the highlights of defense counsel's argument that prompted that. Defense counsel argued, this was a horrible crime. This is what happens when the police and state police crime lab get over-anxious. They discount the evidence that they have that doesn't add up. They reject the evidence that doesn't go with their theory and do whatever it takes to make fit. That's on page RRRR230. Five pages later, defense counsel continues. They had made defendant McDormand's job easier because now they had a target. He and his fellow defectives went about trying to build their case against Timothy Fountain. Eight pages later, make no mistake, ladies and gentlemen, this was not a blind photo array. And it goes on. The police were excited about Timothy Fountain as a suspect because this was a horrible crime. It was on the news. It was on the talk of the neighborhood. They wanted this case solved. Next page, very next page. Now, was it inadvertent or purposeful? It doesn't really change the effect. There's a subtle way of telegraphing, but the choice, correct choices. Two pages later, so he, Brandon Greenzegg, knew who he was supposed to pick out. It's not clues, inadvertent or not, but pressure to perform to identify the man. Five pages later, all the state police crime lab analysis did the DNA work here, knew my client was the target. That's where the bias and flaws in the prosecution case get really exposed. It goes on. Now, CPD had selected Timothy Fountain, this is next page, as the target. Their analysis, which excluded Timothy Fountain, and nobody disputes that, simply wouldn't do. So they went back to build a scientific case against him. Next page later, next two pages. So long it goes over from 253 to 254. They wanted Timothy Fountain not to be excluded. Why? The answer, bias. It's lab bias, it's bias, it's lab bias. It goes on. So now they have to come up with some new reason why Timothy Fountain is not excluded. Next page, 254 to 255. The ISP, the new report, the one-lister analysis they came up with. You bet they did. They came up with it. That's right. They re-ran the report way last Friday. Come on, ladies and gentlemen, and it goes on and on and on to make the exclusion into an exclusion, into a non-exclusion to match up with the police case against my client. That is just a sample of the defense closing argument. And so the defense, the rebuttal argument was proper to address him in those terms. Here, Your Honors, in summary, defendant received a fair trial, Your Honors. He absolutely did when you consider all the evidence in this case. For these reasons and those in our briefs, Your Honors, we ask that this Court affirm defendant's convictions for first-degree murder and armed robbery. Thank you. If I may just make a few points in rebuttal. First, the state's argument that the defense requested a day has to be placed in the proper context and that that's all he was offered. And the state didn't object to the request for a day because it didn't have to. The trial court was doing the state's work for it, essentially, by completely mechanically denying any continuance beyond a single day. Secondly, the state suggests that the defense expert recognized the error in excluding Timothy Fountain. But I would point this Court to Dr. Mueller's testimony, in which he was not saying that the state erred in excluding him or including him. He recognized an error, but it was either the statistical calculation was correct and their declaration as him as a possible contributor was wrong, or the declaration was right, but then their calculation was flawed. So yes, defense expert did recognize an error, but the error was not that, oh, he was excluded when he should have been included. It was that there was an error in that analysis, either in the analysis part or in the statistical calculation part. But it was not that the defense expert said, oh, he's actually included when he should be excluded. It wasn't like that at all. And the state seems pretty dazzled by the fact that the expert printed out two charts in time for this trial. But that is, while a chart is very helpful and useful, and I'm sure he was happy to do it, that is no substitute for time, adequate time, to either confront this new evidence and adjust their trial strategy. And to that end also, whether the defendants actually did want a new expert, again, at the very best it's not clear, because when it first came up on October 18th, the defense told the Court that their expert hasn't seen it yet. On the 19th, they said, we haven't had a chance to go over the new statistics with their experts. And they are questioning, why can we trust that they're done correctly now? We need an expert to see if the stats are correctly or not. It's not clear from defense counsel's argument at that time whether they're talking about the expert in statistical analysis that they had already retained or if they're talking about a new expert in forensic analysis. And then that same day, defense counsel went on and said, we would be ineffective if we did not seek an opinion. Again, it's not clear from this statement if she's talking about, does she need a new opinion from her retained expert or does she need? Nothing precluded the defense from later saying, five minutes later, five days later, we have now decided we need a different new expert. Right. That was not made clear. That's not in the record. So, you know, experienced, and these were good lawyers on both sides, they know how to make a record. And they know how to say things that they may not believe, but they know how to make a record. They do. And they know how to say, I can't go forward, I need a new expert. And that wasn't said here. It wasn't. It wasn't said. But again, this is a situation where they were under the gun. And she was repeatedly telling the court, we're going to be ineffective if we don't seek an expert, if we don't get an opinion. We need more time. There's only so many ways that a defense attorney can say that, realizing that in a couple of days she has to go to trial in front of this judge. And he's telling her, I'll give you a day. That's all I'm going to do. I'll possibly give you a day. Why do you need a day right now? I mean, how hard is a defense attorney expected to push when she's about to represent somebody on incredibly serious charges in front of this judge who is deeply irritated by this request? To the State's point about their eyewitness, again, this eyewitness is not entitled to much weight at all. This was a stranger identification, cross-racial identification. He's a stranger at a bus stop who saw him for a couple of seconds. Again, and also at one point, their witness identified somebody other than Fountain out of a federal array. So relying on this one particular eyewitness is certainly not enough to overcome the prejudice from the other issues in this case. And finally, one last point about the cell phone issue is that the strongest signal is not always the closest. So while it's true that a phone will seek out the strongest signal, again, that's not always the closest one to that person's physical location with their phone. And again, these were incoming phone calls, not outgoing phone calls from Fountain's phone. What about counsel's argument that it goes to the weight of the testimony add to the substance? Well, in Fountain's view, it first goes to the decision of whether there should have been a fried hearing at all. And then I suppose there's some overlap between that and the Foundation argument. And lastly, the State makes a big issue about Defense Counsel's closing argument about lab bias, but I would point you to the fact that the first cellmark DNA analysis report is the only blind one in this case. The first Illinois State Police crime lab report, that was done after they had obtained Mr. Fountain's swab. So the first one is the blind one. That's the one where they didn't have somebody to compare it to. So that alone gave rise to Defense Counsel's argument, which was a reasonable one to give in this situation, and it in no way called for the State's attorney to come back with accusing him of the Illinois State Lottery Commission and U.S. Cellular and all these other organizations and corporations involved in a grand conspiracy. Having a strong closing argument does not invite that kind of argument in return. In conclusion, I ask this Court to consider that a trial is not just a search for a conviction. The principle of a just and fair trial depends on this Court for its vitality and strength. The effort at a just and fair trial was deeply distorted here by the trial court's failure to allow the defense a reasonable continuance to confront newly disclosed DNA evidence, and also for refusing to subject the State's proposed cell site evidence to a FRI hearing. The request in this case would aid in the search for the truth and ensure a just and fair trial. Mr. Fountain respectfully requests that this Court reverse this conviction and grant him a new trial. Thank you. Thank you very much. The Court, all of us, would like to compliment the attorneys on the fine job they did on their briefing and arguments. We will take the matter under consideration. The Court stands in recess. Thank you very much.